**BANK OF WASHINGTON v. SAN BENITO & R. G. V. RY. CO. et al.   (No. 7711.)**

Court of Civil Appeals of Texas. San Antonio. March 2, 1927.

Rehearing Denied March 30, 1927.

1. **Fraud ⟐11(1)—Bank loaning money to contractor on pledge of estimated receipts from construction could not hold other contracting party for mistaken estimate.**

Bank advancing money to contractor upon pledge of amount to become due in constructing railroad could not hold railroad or other contracting party, acting either for himself or as agent of undisclosed principal, for mistaken honest opinion of probable amount to become due.

2. **Trusts ⟐210—Liability of one contracting to build railroads for profit was not affected by designation of himself as trustee in contracts.**

Liability of party contracting with railroads to build lines for his own profit was not affected by description and signature of himself as trustee, in suit by contractor's pledgee.

3. **Trusts ⟐171—"Trustee" is one in whom property is vested for another.**

A "trustee" is generally a person in whom some estate or property is vested for another, and is in no sense an agent.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Trustee.]

4. **Trusts ⟐210—Trustee undertaking to contract independently as trustee is personally liable, in absence of express stipulation.**

When trustee as such undertakes to contract independently as a trustee, he becomes liable personally, unless he stipulates to the contrary.

5. **Fraud ⟐11(1)—Expression of honest opinion is not actionable.**

A statement obviously made as expression of opinion on which purchaser is not justified in relying is not actionable.

Appeal from District Court, Cameron County; A. M. Kent, Judge.

Action by the Bank of Washington against the San Benito & Rio Grande Valley Railway Company and others. From a judgment for the defendants on trial to the court without a jury, plaintiff appeals. Affirmed.

Seabury, George & Taylor, of Brownsville, for appellant.

Davenport, West & Ransome, of Brownsville, and W. G. B. Morrison, of Houston, for appellees.

COBBS, J. Appellant sued appellees on an alleged debt of $7,383.60, with legal interest from June 1, 1913; said sum being the amount of an estimate for the month of May, 1913, issued by the said railway company for work and material furnished by the Hidalgo Construction Company for the construction and completion of its lines of railroad in Cameron and Hidalgo counties, Texas.

Appellant alleged that on May 20, 1913, upon certain representations made by A. T. Perkins, appellee, it loaned $10,000 to the Hidalgo Construction Company, taking its promissory note therefor, secured by a pledge of the May, 1913, estimate aforesaid, also the first money earned thereafter, if said May estimate should be insufficient to pay said note; that on the same date the Hidalgo Construction Company gave it an assignment in writing of said estimate and moneys later to be earned as aforesaid; that about June 13, 1913, said railway company duly issued said estimate for the month of May, 1913, amounting to $7,383.60, which estimate was immediately turned over by the Hidalgo Construction Company to appellant's agent, William R. Compton Bond & Mortgage Company, of St. Louis, Mo., together with a draft for said sum drawn by it in favor of said agent on R. R. Tompkins of St. Louis, Mo., the disbursing officer and agent for appellees; that said estimate has never been paid in whole or in part. And appellant alleged that it had obtained judgment on said note against the makers and indorsers thereof, one of whom has since been adjudged a bankrupt and discharged, and the others are dissolved corporations; that said judgment is uncollectable; and that the collections and other collateral leave unpaid on said note and uncollectable a sum in excess of said estimate and interest, of which estimate appellant is now full owner by purchase at pledgee's sale.

Appellant further alleged that the work in question was done under a contract between Hidalgo Construction Company and A. T. Perkins, "trustee," dated July 1, 1912, by which said company undertook to construct and complete said lines of railroad, and A. T. Perkins agreed to pay it on monthly estimates the actual cost of the work, plus a bonus of

───────

$500 per mile; that this contract was made pursuant to an agreement between said railway company and A. T. Perkins, whereby all the capital stock and bonds of said railway company and all bonuses obtained from landowners were to be turned over to said Perkins, who was also to receive a separate fee or bonus, and who undertook to construct and complete said lines of railroad, and that the loan to said Hidalgo Construction Company was induced by representations made by said A. T. Perkins to appellant's said agent to the effect that the May, 1913, estimate would be $9,000 or more, and that he knew no reason why same should not be paid in due course.

Appellees answered separately.

The debt sued on arose from a contract between the Hidalgo Construction Company and A. T. Perkins, trustee, which contract was introduced in evidence, together with two other contracts of the same date, between A. T. Perkins, trustee, and the San Benito & Rio Grande Railway Company, and between A. T. Perkins, trustee, and the St. Louis & San Francisco Railroad Company. The actual practice under the contract between Mr. Perkins, as trustee, and the Hidalgo Construction Company, was that at the end of each month an estimate of the costs of the work would be made out, properly certified, and forwarded with the draft on R. R. Tompkins. Mr. Tompkins was secretary to Mr. A. T. Perkins, and he acted as fiscal agent for the St. Louis & San Francisco Railroad Company in paying these drafts. After these estimates were approved by Mr. Perkins, they were paid by the St. Louis & San Francisco Railroad Company.

Frequently the Hidalgo Construction Company pledged these estimates in advance in order to obtain funds with which to operate, and for a long time prior to May, 1913, these estimates had been pledged to Wm. R. Compton Bond & Mortgage Company, of St. Louis, or to clients of that company. Before the loan was made on the estimate involved in this suit, Mr. Fred Emert, of Wm. R. Compton Company, inquired of Mr. Perkins with reference to the amount of the estimate for the month of May, 1913, and whether there was any reason that it would not be paid as usual, to which Mr. Perkins replied that there was no reason he knew of that it would not be paid promptly.

On May 20, 1913, the St. Louis & San Francisco Railroad Company went into the hands of a receiver, and work was stopped on the San Benito & Rio Grande Valley Railway Company. Mr. Perkins held up the approval of the May, 1913, estimate, and, about the end of June, went to San Benito, Tex., checked up the books of the Hidalgo Construction Company, and ascertained that he had already paid the Hidalgo Construction Company some $10,000, which had been included in previous estimates for labor and material, for which the Hidalgo Construction Company had not paid, and he declined approval and payment of the May, 1913, estimate.

On July 1, 1912, A. T. Perkins entered into three contracts in writing, one with the San Benito & Rio Grande Valley Railway Company, one with the Hidalgo Construction Company, and one with the St. Louis & San Francisco Railway Company. In all of these contracts he signed, "A. T. Perkins, trustee," and at the opening of each contract he inserted after his name: "Acting solely as trustee and hereinafter called trustee." All of these contracts related to the completion of certain lines of railroad for the San Benito & Rio Grande Valley Railway Company, already partly built under an earlier contract with S. A. Robertson, and the construction of new lines of railroad for the San Benito & Rio Grande Valley Railway Company.

By his contract with the San Benito & Rio Grande Valley Railway Company, Mr. Perkins was to construct and complete the construction of said lines of railway, for which he was to get all of the first mortgage bonds issued by that company, same to be issued to the full extent authorized by law, and also all of its capital stock issued in excess of $50,000 par value, no other stock or bonds meanwhile to be issued by said railway company. In addition to this he had a side agreement with said railway company whereby he was to be paid a fee or bonus "for handling this matter on behalf of the San Benito & Rio Grande Valley Railway Company, and that company never paid it."

In the contract between A. T. Perkins and the St. Louis & San Francisco Railroad Company, Mr. Perkins sold and agreed to transfer all of said first mortgage bonds and capital stock of the San Benito & Rio Grande Valley Railway Company to the St. Louis & San Francisco Railroad Company, and "in consideration of the sale and transfer" of same the latter company agreed to advance to Mr. Perkins the moneys necessary to enable him to complete the construction of said lines of railroad as provided in the construction contract between him and the San Benito & Rio Grande Valley Railway Company, not to exceed the total cost to Mr. Perkins of the work, such advances to be made monthly.

In the contract between A. T. Perkins and Hidalgo Construction Company, the construction company agreed to construct and complete said lines of railroad, and Mr. Perkins was to pay it therefor the actual cost to it, plus a bonus of $500 per mile. Furthermore, said company and S. A. Robertson, who was also a party to the contract, agreed to put in proper contractual condition all subscription contracts, bonus agreements, cash, notes, and lands which they had obtained or might be able to obtain as donations or contributions for the construction of said lines of railroad, and to get new bonus contracts as far as pos-

sible, and to turn the whole over to the said A. T. Perkins.

Prior to May, 1913, the Hidalgo Construction Company had been obtaining advances against these estimates, prior to their issuance, from William R. Compton Bond & Mortgage Company of St. Louis, Mo., and clients of that company, among whom was the appellant, Bank of Washington. When the estimate would be thereafter issued, it would be sent to said bonding house, together with a draft drawn by Hidalgo Construction Company for the amount of the estimate upon R. R. Tompkins of St. Louis, Mo., who was a clerk in the office of A. T. Perkins. Promptly thereafter, generally the same day, Mr. Perkins would pay the draft with a check of the St. Louis & San Francisco Railroad Company. Prior to the May, 1913, estimate, all estimates had been paid without rebate, reduction, or delay.

It is alleged that before making its last advance against the May, 1913, estimate, the Bank of Washington inquired of Mr. Perkins as to how much the May, 1913, estimate would amount to, and if there was any reason why it would not be paid as usual. His answer was that it would be $9,000 or more, and would be paid promptly. The exact statement made by Mr. Perkins is in dispute. Whatever it was, the Bank of Washington, it is alleged, relied on the statement and was thereby induced to make the loan.

Shortly afterward the St. Louis & San Francisco Railroad Company went into the hands of receivers, and on this account Mr. Perkins declined payment of the draft drawn for the May, 1913, estimate. His letter of June 10, 1913, stated:

"As soon as certified statement of the estimates in question are received, it will be necessary for the trustee of this construction account to file claim with the St. L. & S. F. receivers."

On June 16, 1913, he wrote that the St. Louis & San Francisco Railroad Company was under contract with him to provide funds for the construction of said railway, that he was taking the matter up with the receivers, and asked that the draft be held for a few days until the attitude of the receivers could be ascertained. Immediately afterward Mr. Perkins went to San Benito, Tex., caused a check of the accounts of the Hidalgo Construction Company and San Benito & Rio Grande Valley Railway Company to be made, and ascertained (it was also otherwise established by uncontroverted evidence) that in estimates earlier than May, 1913, items aggregating about $10,000 had been included and therefore paid to the Hidalgo Construction Company for labor and material that went into the railroad, but which said construction company had itself not settled for with the persons furnishing same. There is no evidence showing that

these items were afterwards paid by either of appellees to the said persons.

This suit was brought October 25, 1913. Afterwards, on December 31, 1913, first mortgage bonds of the San Benito & Rio Grande Valley Railway Company aggregating $953,735 were issued, and these bonds, together with 200 shares of stock of said company, par value $20,000, were turned over by said railway company to Mr. Perkins at a somewhat later date, and were by him turned over to the Frisco receiver. Later on other bonds followed the same course. It is conceded by both parties that there is no dispute of this evidence, save and except as to the testimony of Mr. Perkins himself, which will be fully noted and restated herein hereafter.

Shortly after this transaction the St. Louis & San Francisco Railroad was placed in the hands of a receiver of the court. The payment of the estimate was refused on or about June 10, 1913, because it would be "necessary for the trustee of this construction account to file claim with the receiver." Thereafter, in making the estimates, he discovered that, in earlier estimates than May, 1913, as stated, items aggregating $10,000 had been made and paid the construction company for labor, etc., and the construction company had not settled for the same.

This case was tried without a jury and judgment rendered in favor of appellee.

[1] The main proposition and contention throughout is that the uncontradicted evidence showing that the Bank of Washington as the assignee of the Hidalgo Construction Company is the owner of the contractor's estimates sued on and unpaid, which are outstanding claims, for which the bank is entitled to a judgment. This contention includes all the issues, though there are other assignments and various propositions raising the same question in other ways; but to determine this issue we are required to discuss the whole case together.

A. T. Perkins entered into three contracts all dated as of July 1, 1912, with San Benito & Rio Grande Valley Railway Company, St. Louis & San Francisco Railroad Company, and Hidalgo Construction Company, respectively. In each contract where the parties are first named there occurs after the name of A. T. Perkins the words, "acting solely as trustee and hereinafter called trustee," and Mr. Perkins signs each contract, "A. T. Perkins, Trustee."

In the contract with the San Benito & Rio Grande Valley Railway Company no reference is made to either of the other contracts. Mr. Perkins therein agrees to construct and complete the construction, on rights of way and grounds owned by the San Benito & Rio Grande Valley Railway Company, of certain lines of railroad set out in detail, including terminals, depots, yards, etc., before July 1, 1913, time being of the essence of the con-

tract, and to deliver same free of liens and with all construction debts paid. In consideration for all work done, material furnished, and everything else, the railway company agreed to issue and deliver to him all of its capital stock, in excess of $50,000 par value, and its entire issue of First Mortgage Bonds bearing 6 per cent. interest which shall be issued to the full amount authorized by the proper authorities of the state of Texas. The contract provides that before accepting the lines of railroad and paying therefor, the company shall be furnished satisfactory evidence of the payment of every claim and indebtedness incurred by the trustee or those acting under him, or for which he or they may be made liable, in the work provided for or in the purchase of material therefor, and provides that the stock and bonds shall be delivered only upon certificate of the engineer of the company, and that said lines of railroad are wholly free and discharged of any claim or indebtedness, and that Mr. Perkins has paid all sums for which he has become liable directly or indirectly.

In the contract between Mr. Perkins and the St. Louis & San Francisco Railroad Company reference is made to the foregoing contract, but not to the contract with the Hidalgo Construction Company. By this contract Mr. Perkins agrees to complete said lines of railroad in accordance with his contract with the San Benito & Rio Grande Valley Railway Company in order to receive the bonds and capital stock of that railway company in payment therefor. He agrees to sell said stock and bonds, and sells in præsenti his right therein, to the St. Louis & San Francisco Railroad Company, and agrees to do all things necessary to vest full legal title thereto in said railroad company; and in consideration of the sale and transfer of such stock and bonds the said railroad company agrees to advance to Mr. Perkins from time to time during the progress of the work the funds necessary to enable Mr. Perkins to complete the construction of said lines of railroad, not to exceed the total cost to him of the work.

The contract between Mr. Perkins and the Hidalgo Construction Company makes no reference to the contract last above, but refers to the contract with the San Benito & Rio Grande Valley Railway Company. By this contract the Hidalgo Construction Company agrees to construct and complete said lines of railroad, and Mr. Perkins agrees to pay it therefor the actual cost of construction plus a bonus of $500 per mile, payment to be made on monthly estimates as the work progresses. S. A. Robertson is also a party to this contract. In said contract Hidalgo Construction Company and S. A. Robertson agree to put in proper contractual condition "all the subscriptions, bonus agreements, cash, notes, and lands which they, or either of them, have obtained, or which they, or either of them, may be able to obtain as donations for the construction of said lines of railroad, and to take all needful and proper steps to have same placed in proper legal form so that they may be collectable in law." And the same parties undertake to continue to secure as far as practicable other bonuses, subscriptions, etc., for the construction of further lines of railroad. All these subscriptions, etc., are to be turned over to Mr. Perkins and they are made part of the consideration for the bonus of $500 per mile to the Hidalgo Construction Company and for the assumption by Mr. Perkins of any indebtedness owed to S. A. Robertson by the St. Louis, Brownsville & Mexico Railway Company under an earlier contract between those two parties.

By his contract with the San Benito & Rio Grande Valley Railway Company Mr. Perkins was to pay all damages to other persons and property resulting from the acts or negligence of himself or those under him in the construction of said lines of railroad. This obligation was passed on to the Hidalgo Construction Company by this contract, but that company was prohibited from making settlement of any such claim in excess of $200 without the approval of Mr. Perkins. The contract with the St. Louis & San Francisco Railroad Company contains no provision for the inclusion of such items in the cost of construction to be paid by it.

The contract with the St. Louis & San Francisco Railroad Company contains no provision for that company's paying Mr. Perkins for the amount that he would be required to pay in liquidation of the unfulfilled obligations of the St. Louis, Brownsville & Mexico Railway Company to S. A. Robertson under the Hidalgo Construction Company's contract. Said contract with the St. Louis & San Francisco Railroad Company contains no provision in regard to the disposition of the bonus, subscriptions, etc., that Mr. Perkins was to get under the contract with Hidalgo Construction Company from that company and S. A. Robertson.

Mr. Perkins testified that he had an arrangement with the San Benito & Rio Grande Valley Railway Company, not embraced in his written contract with it, whereby he was to be paid a commission, bonus, or fee for handling this construction for that railway company, the amount thereof not stated, and that he had no other agreement, oral or written, with the St. Louis & San Francisco Railroad Company, except that of July 1, 1912, being the written contract of that date.

As there is no dispute about the testimony, save the one stated, we have largely adopted appellant's statement of the case and the facts as presented, because appellees concede that they are correct.

One of the grounds, and the main one, upon which it is sought to recover a personal judgment against Perkins, is predicated upon his

signature as "trustee" and the statement that the William R. Compton Company would make no further loans, but that appellant would. Mr. Emert, the vice president of that company, made that statement. Mr. Perkins testified:

"I remember Mr. Emert, whom I knew very well as a member of the firm of Compton & Co. asking me about this May estimate, whether they were likely to be of about the same amount as previous months, and I told him I could not tell about any estimate until I could check it, but as far as I knew—and combining the two interviews he is speaking of—as far as I knew at that time of his inquiry as to the probable amount of work done and to be done, the amount of work would involve expenditure of probably as much as nine or even as much as eleven thousand dollars, but I explained to him very carefully when he asked me about that that I could only give him what my opinion would be as to the probable result. I had no way of getting at any estimate positively at that time. Mr. McLellan was the chief engineer from whom I received my preliminary estimates, and when Mr. Emert asked me about the May estimate, I told him, of course, that I would look over this and let him know later in the day what I thought would be the amount of work done. Those preliminary estimates had recently come to St. Louis. I don't know what day they arrived, and I did look those over, and it was a result of that when I telephoned him in the afternoon I thought the amount of work would be about $9,000, possibly, or as much as $9,000, and maybe up to $11,000; I could not tell. I never knew the Bank of Washington in connection with these estimates or either of them; I never saw anybody I knew of connected with the Bank of Washington until day before yesterday on the train coming down here; I never knew anything about them."

Mr. Perkins was not acting for any trust estate, nor in any respect in a personal way with appellant. His position is well shown by the contract itself and was understood by the parties. That he was dealing for his own profit is too clear for discussion, for he was receiving a bonus or consideration from the several corporations. The word "trustee" attached to his signature, with the words following, "acting solely as trustee and hereafter called trustee," had no significance whatever. It was a designation for his own purposes, perhaps to show for his own convenience in dealing with other persons who perhaps were interested in the contract, who did not desire a disclosure of their names in the record. If he was not bound to appellee upon a written express obligation, the signing of the paper as "trustee" did not bind him. If he is to be treated as an agent merely, then he is released from personal obligation because his principal is disclosed. He is not bound as an independent contractor either. There is no allegation or proof that he fraudulently induced the appellee to advance the money and that appellee parted with the money upon such fraud and fraudulent misrepresentation. There is no allegation or sufficient proof that the appellee relied upon the statement and was thereby induced to enter into the contract to advance the money. At most the proof shows that the money was advanced upon the vouchers that would come in payment of certain work. All that appellee said or did was to give an honest opinion as to what the voucher would probably produce. If appellee relied on anything it was based upon appellee's opinion, which was made in good faith without any fraud.

[2] We see no reason for his signing as "trustee." If he did not, by his act and conduct, bind himself to pay appellee, simply signing the papers as trustee did not do so, as the parties knew his status. To bind him in law covenanting as trustee he must be personally bound thereby, for in that case the use of the word "trustee," limited by other words as it was, served as a matter of description for his own use and purpose and in no degree affects the rights or remedies of others.

[3, 4] A trustee is in no sense an agent, for an agent acts for his principal. A trustee is generally a person in whom some estate or property is vested for another. When a trustee as such undertakes to contract independently as a trustee he becomes liable personally, unless he stipulates to the contrary. Taylor v. Davis, 110 U. S. 330, 4 S. Ct. 147, 28 L. Ed. 163; Duvall v. Craig, 2 Wheat. (15 U. S.) 45, 4 L. Ed. 180. But in this case Mr. Perkins undertook to state his status and to show he did not intend to be personally bound by the use of the word "trustee" after the name, and the use of the clause, "solely as trustee," explained his status. There is nothing to show that appellees gave the credit in any respect upon the supposed idea that Perkins was personally liable or to become so. It is clear that all the parties understood that Perkins was not to become personally responsible or liable for the money advanced. This appears from their action with the contractor's estimates.

It acquired the contractor's estimates, issued through Compton & Co., who were its agents in collecting the amounts due on the estimates. Perkins would check these estimates, and when issued were attached to drafts not drawn upon Perkins, but upon his secretary as a "fiscal agent," and when O. K.'d by Perkins were paid by the check of the St. Louis & San Francisco Railroad Company, signed by F. H. Hamilton, its president. Appellee and its agents, Compton & Co., knew that Mr. Perkins never paid the vouchers himself; that he merely O. K.'d them and then they were paid by the St. Louis & San Francisco Railroad Co. This explains the reply of Mr. Perkins to the questions of Mr. Emert of Compton & Co. as to whether the estimates would be paid as usual, and not whether Mr. Perkins would pay them, individually, when presented. There is nothing to show that at

that time there was any such construction in their minds to show it was intended that Mr. Perkins was to be personally bound. There is nothing shown by pleading or proof that tends in the least to show any liability on the part of the San Benito & Rio Grande Valley Railway Company.

[5] We do not think there was any reason for Mr. Perkins stating, at the time of his conversation with Mr. Emert in regard to the estimate, that he held offsets against this estimate or that he claimed the right, under his contract with the Hidalgo Construction Company, to make offsets against this estimate, for any amount that he may have paid on previous estimates in settlement of labor and material, which that company had not in fact paid to those who furnished the labor and material. In that conversation Mr. Perkins was simply asked for his opinion about the May estimate. Appellant, through its agents, well knew the manner in which the business was carried on prior to the assignment. In seeking the opinion of Mr. Perkins, of which they were already well advised, it clearly appears they were not looking to Mr. Perkins to pay the debt of another, but seeking information in respect to the chances of their being paid through the vouchers. There was nothing said or done that bound Mr. Perkins to the payment of these claims or estopped him from claiming the offsets. He owed no duty to appellant that required such a voluntary statement. He was not interrogated as to whether there was or probably would be any offsets. There was no fraud alleged or charged nor any proven to affect appellant's rights in any way on that theory, nor any obligation not to incur necessary debts in the construction. A statement which by reason of its form or subject-matter amounts merely to an expression of opinion is not actionable, for it is one upon which reliance cannot be safely placed. 20 Cyc. 17. As said in Hunter v. Building & Loan Ass'n, 24 Tex. Civ. App. 453, 59 S. W. 596:

"Appellant could recover only upon allegation and proof of fraud and misrepresentation on the part of the association as to material existing facts. Representations by officers of the association as to the time when shares would mature are mere matters of opinion, and do not constitute such fraud or misrepresentation as will vitiate the contract of membership induced by them."

So that a statement, when made in respect to its form or subject-matter, as in this case, obviously made as the expression of an opinion, is one on which the purchaser is not justified in relying, and therefore is not actionable. Black on Rescission, §§ 68, 76, and 79.

Therefore, in the absence of any charge or proof of fraud, real or constructive, or reliance solely upon the statement of Perkins giving his opinion in reply to the questions put to him, no estoppel arises. Corpus Juris, vol. 21, p. 1119, § 122, and pages 1142, 1145. The testimony shows that Mr. Perkins explained the situation fully and added he knew of no reason why the estimate would not be paid. At that time he did not know the condition of the books. Subsequently he ascertained from an examination of the books that improper amounts had been previously included in the estimates.

A careful examination of the record in this case convinces us that there were no reversible errors committed that should require a reversal, and the judgment is affirmed.